IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

KENNETH GERALD THERRELL,

      Plaintiff,

  vs.                                                               1:15-cv-00782-LF

NANCY A. BERRYHILL,[1]
Acting Commissioner of the
Social Security Administration,

      Defendant.

## **MEMORANDUM OPINION AND ORDER**

THIS MATTER comes before the Court on plaintiff Kenneth Gerald Therrell's Motion to Reverse and Remand Administrative Agency Decision, filed February 18, 2016, and fully briefed on June 28, 2016. Docs. 18, 24, 25. The parties have consented to my entering a final judgment in this case. Doc. 12. Having meticulously reviewed the entire record and being fully advised in the premises, I find that the Administrative Law Judge ("ALJ") applied the correct legal standards when formulating Mr. Therrell's residual functional capacity and presented a proper hypothetical to the vocational expert ("VE"). I further find that the ALJ properly relied on the VE's testimony in determining that there were a significant number of jobs available in the national economy that Mr. Therrell could perform. I therefore DENY Mr. Therrell's motion and AFFIRM the decision of the Commissioner.

---

[1] Nancy A. Berryhill, the new Acting Commissioner of Social Security, is automatically substituted for her predecessor, Acting Commissioner Carolyn W. Colvin, as the defendant in this suit. FED. R. CIV. P. 25(d).

## I. Standard of Review

The standard of review in a Social Security appeal is whether the Commissioner's final decision[2] is supported by substantial evidence and whether the correct legal standards were applied. *Maes v. Astrue,* 522 F.3d 1093, 1096 (10th Cir. 2008). If substantial evidence supports the Commissioner's findings and the correct legal standards were applied, the Commissioner's decision stands, and the plaintiff is not entitled to relief. *Langley v. Barnhart,* 373 F.3d 1116, 1118 (10th Cir. 2004). "The failure to apply the correct legal standard or to provide this court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal." *Jensen v. Barnhart,* 436 F.3d 1163, 1165 (10th Cir. 2005) (internal quotation marks and brackets omitted). The Court must meticulously review the entire record, but may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *Flaherty v. Astrue,* 515 F.3d 1067, 1070 (10th Cir. 2007).

"Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Langley,* 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record or if there is a mere scintilla of evidence supporting it." *Id.* While the Court may not reweigh the evidence or try the issues de novo, its examination of the record as a whole must include "anything that may undercut or detract from the ALJ's findings in order to determine if the substantiality test has been met." *Grogan v. Barnhart,* 399 F.3d 1257, 1262 (10th Cir. 2005). "'The possibility of drawing two inconsistent conclusions from the evidence does not prevent [the] findings from being supported by substantial evidence.'" *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007) (quoting *Zoltanski v. F.A.A.*, 372 F.3d 1195, 1200 (10th Cir. 2004)).

---

[2] The Court's review is limited to the Commissioner's final decision, 42 U.S.C. § 405(g), which generally is the ALJ's decision, 20 C.F.R. §§ 404.981, as it is in this case.

## II. Applicable Law and Sequential Evaluation Process

To qualify for disability benefits, a claimant must establish that he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505(a).

When considering a disability application, the Commissioner is required to use a five-step sequential evaluation process. 20 C.F.R. §§ 404.1520; *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987). At the first four steps of the evaluation process, the claimant must show: (1) the claimant is not engaged in "substantial gainful activity;" (2) the claimant has a "severe medically determinable . . . impairment . . . or a combination of impairments" that has lasted or is expected to last for at least one year; *and* (3) the impairment(s) either meet or equal one of the Listings[3] of presumptively disabling impairments; *or* (4) the claimant is unable to perform his or her "past relevant work." 20 C.F.R. §§ 404.1520(a)(4)(i–iv); *Grogan*, 399 F.3d at 1261. If the claimant cannot show that his or her impairment meets or equals a Listing but proves that he or she is unable to perform his or her "past relevant work," the burden then shifts to the Commissioner, at step five, to show that the claimant is able to perform other work in the national economy, considering the claimant's residual functional capacity ("RFC"), age, education, and work experience. *Id.*

---

[3] 20 C.F.R. pt. 404, subpt. P, app. 1.

### III. Background and Procedural History

Mr. Therrell lives with his wife,[4] has a ninth-grade education, and has a history of working as a service technician for heating and cooling systems and in the construction trades. AR[5] 41, 42–46, 67, 171–73. Mr. Therrell was 55 years old when he applied for disability insurance benefits in July of 2012. AR 142. He originally alleged disability as of February 1, 2008, due to a heart condition. AR 13, 68, 142. The Commissioner denied his claim initially and upon reconsideration. AR 85–88, 91–96. Mr. Therrell requested a hearing before an ALJ, and ALJ John W. Rolph held a hearing on June 5, 2014. AR 29–66, 97–98. At the hearing, Mr. Therrell amended his alleged onset date to January 1, 2011. AR 35, 45.

The ALJ issued his unfavorable decision on September 8, 2014. AR 10–28. The ALJ found that Mr. Therrell met the insured status requirement of the Social Security Act through March 31, 2012. AR 15. At step one, the ALJ found that Mr. Therrell had not engaged in substantial, gainful activity between his alleged onset date of January 1, 2011 and his date last insured. *Id.* Because Mr. Therrell had not engaged in substantial gainful activity for at least 12 months, the ALJ proceeded to step two. At step two, the ALJ found that Mr. Therrell suffered from the severe impairments of "minimal coronary artery disease with noncardiac chest pain; syncopal episodes; and degenerative disc disease of the cervical spine with disc protrusion of the C5–C6 vertebrae . . . ." *Id.* The ALJ found that Mr. Therrell had several nonsevere impairments: a gunshot wound to his left arm, injuries sustained by falling due to syncope, a cyst in his sinus, hypertension, hypokalemia, hypercholesterolemia, lung hypoinflation with bibasilar atelectasis,

---

[4] On his application for disability benefits, Mr. Therrell indicates that he is not married. AR 142. His disability report and medical records, however, make reference to Mr. Therrell's wife. AR 171, 275, 277, 286, 378, 440, 452, 468, 506, 533, 534, 538, 542, 566, 649, 650, 736, 820.

[5] Documents 15-1 through 15-28 comprise the sealed administrative record ("AR"). When citing to the record, the Court cites to the AR's internal pagination rather than the CM/ECF document number and page.

right-sided weakness in his arm and leg, anxiety with panic attacks, alcohol abuse, tobacco abuse, and post-traumatic stress disorder. AR 16–17. At step three, the ALJ found that none of Mr. Therrell's impairments, alone or in combination, met or medically equaled a Listing. AR 18.

Because none of the impairments met a Listing, the ALJ moved to step four. At step four, the ALJ found that:

> . . . the claimant had the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) except that he may never climb ladders, ropes, and scaffolds, and he must avoid all exposure to hazards such as dangerous machinery and unsecured heights. He is able to perform work tasks that do not involve operation of a motor vehicle.

*Id*. The ALJ found that Mr. Therrell was unable to perform any of his past relevant work as a service technician in heating and cooling, a tank inspector, a construction worker, or a maintenance worker. AR 22.

At step five, relying on the testimony of the VE, the ALJ concluded that, through the date he was last insured, "there were jobs that existed in significant numbers in the national economy that the claimant could have performed," *id*., and that Mr. Therrell was "capable of making a successful adjustment to other work that exists in significant numbers in the national economy." AR 24. Accordingly, the ALJ found that Mr. Therrell was not disabled. *Id.*

On July 24, 2015, the Appeals Council denied Mr. Therrell's request for review, making the ALJ's decision the final decision of the Commissioner and prompting this appeal. AR 1–4. Mr. Therrell timely filed his appeal to this Court on September 3, 2015. Doc. 1.

**IV. Mr. Therrell's Claims**

Mr. Therrell raises two main arguments on appeal: (1) the ALJ failed to pose a complete hypothetical to the vocational expert because he failed to include the effect that Mr. Therrell's episodes of syncope would have on a hypothetical claimant's occupational base; and (2) the ALJ

5

improperly relied on the number of jobs cited by the VE because the numbers used by the VE were "grossly inflated" and inconsistent with the Dictionary of Occupational Titles ("DOT").

V. **Discussion**

   a. **The ALJ did not err by failing to include language about Mr. Therrell's syncopal episodes in his RFC or hypothetical to the VE.**

Mr. Therrell first argues that the ALJ's hypothetical question posed to the VE is incomplete. Doc. 18 at 12–14. An ALJ's hypothetical question to a VE at step five must accurately and precisely reflect all of the claimant's impairments and limitations, "but they need only reflect impairments and limitations that are borne out by the evidentiary record." *Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996)) (internal citations omitted).

At the hearing, the ALJ posed the following hypothetical to the VE:

> Initially, I would like you to assume a hypothetical individual who's able to perform the full range of medium work as defined by the regulations. However, this individual may never climb ladders, ropes, and scaffolds; and this individual must avoid all exposure to hazards such as dangerous machinery and unsecured heights. This individual is able to perform work tasks that do not involve operation of a motor vehicle.

AR 59. Mr. Therrell criticizes the ALJ for failing to include in his RFC and hypothetical that he suffers from "'clusters' of syncopal episodes occurring between two and eight times a year, in which he loses consciousness and falls to the floor. He remains unconscious for between two and thirty minutes. Such syncopal episodes are triggered by stress and periods of prolonged standing." Doc. 18 at 14. The problem with this additional language is that it is not supported by the medical evidence in the record for the relevant time period.

In disability insurance benefits cases such as this one, the relevant time period is from the alleged onset date through the date the claimant was last insured. *See* SSR 83-20, 1983 WL 31249, at *1 ("The onset date of disability is the first day an individual is disabled as defined in the Act and the regulations. . . . A title II worker cannot be found disabled under the Act unless

6

insured status is also met at a time when the evidence establishes the presence of a disabling condition(s)."); 20 C.F.R. § 404.131(a) ("To establish a period of disability, you must have disability insured status in the quarter in which you become disabled or in a later quarter in which you are disabled."); *Potter v. Sec'y of Health & Human Servs.,* 905 F.2d 1346, 1348–49 (10th Cir. 1990) ("the relevant analysis is whether the claimant was actually *disabled* prior to the expiration of [his or her] insured status") (emphasis in original).

Here, the relevant time period is January 1, 2011 (the amended alleged onset date) through March 31, 2012 (the date Mr. Therrell was last insured). AR 15, 35, 45. Mr. Therrell had two episodes of syncope during this time period: one on January 7, 2012, AR 299 (Mr. Therrell presented at the emergency room complaining of chest pains and falling to the floor with seizure)[6]; and one on February 6, 2012, AR 648–59 (Mr. Therrell presented to emergency room complaining of loss of consciousness after the Super Bowl and appeared intoxicated). The ALJ noted that Mr. Therrell's syncopal episodes were unexplained by either cardiopulmonary disease or intracranial abnormality. AR 20 ("The claimant's treatment record during his relevant period reveals minimal problems with his heart due to coronary artery disease, and no intracranial abnormalities that would indicate his syncopal episodes [are] neurological in nature.").

Mr. Therrell argues that his syncope is caused by periods of prolonged standing, Doc. 18 at 12, but does not point to any evidence in the record that would indicate that the syncopal episodes within the relevant time period were caused by prolonged standing. For example, the episode on January 7, 2012 (which was not diagnosed as syncope by the medical providers)

---

[6] Although the ALJ characterized the January 7, 2012 fall as a syncopal episode, AR 20, the medical records do not note loss of consciousness. Rather, the medical records state that Mr. Therrell "had a fall," chest pains, and suffered a seizure. AR 299–300. Regardless, the Court will adopt the ALJ's characterization of the January 7, 2012 episode for purposes of this opinion.

7

notes that Mr. Therrell fell down, hit the floor, stood up, and fell again. AR 299. There is no indication, however, that Mr. Therrell had been standing for a long period of time before his fall. Similarly, when Mr. Therrell presented at the emergency room on February 6, 2012, he reported that he had just finished watching the Super Bowl, but he did not indicate that he had been standing prior to losing consciousness. AR 648. Mr. Therrell testified that his syncope was caused by stress, not by standing for long periods of time. AR 40–41. One of Mr. Therrell's medical providers thought that the cause most likely was vaso-vagal syncope.[7] AR 322. Whatever the cause, however, there is no evidence in the record to suggest that these two episodes of syncope would have limited Mr. Therrell's ability to perform work activities during the relevant time period.

Ignoring the relevant time period, Mr. Therrell cites episodes of syncope outside of relevant time period and argues that "[i]t seems unlikely that the frequency and severity of such episodes would be tolerated by any employer." Doc. 25 at 3. Thus, he concludes, his proposed limitation should have been included in the hypothetical to the VE. *Id.*

"Evidence outside the relevant time period may be considered to the extent that it assists the ALJ in determining disability during the relevant time period." *Overstreet v. Astrue*, 2012 WL 996608, at *9 (N.D. Okla. Mar. 23, 2012) (unpublished) (citing *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004)); *Pyland v. Apfel*, 149 F3d 873, 877 (8th Cir. 1998) ("Evidence of a disability subsequent to the expiration of one's insured status can be relevant . . . in helping

---

[7] Vasovagal syncope occurs when the body overreacts to certain triggers, such as the sight of blood or extreme emotional distress. It is also called neurocardiogenic syncope. *See* http://www.mayoclinic.org/diseases-conditions/vasovagal-syncope/home/ovc-20184773. "Vasovagal syncope is usually harmless and requires no treatment," but it's possible to injure oneself during a vasovagal syncope episode. *Id.* One common trigger of vasovagal syncope includes standing for long periods of time. *See* http://www.mayoclinic.org/diseases-conditions/vasovagal-syncope/symptoms-causes/dxc-20184778.

8

to elucidate a medical condition during the time for which benefits might be rewarded."). Evidence outside of the relevant time period, however, is not dispositive. A finding of disability based solely upon evidence outside the relevant time period "would be contrary to the Social Security Act, 42 U.S.C. §§ 416(i), 423(c), which requires proof of disability during the time for which it is claimed." *Pyland,* 149 F.3d at 878.

In this case, the ALJ considered Mr. Therrell's syncopal episodes, including those that occurred before and after the relevant time period. AR 19–21. The ALJ found that, although Mr. Therrell suffered from episodes of syncope, "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision." AR 19. The ALJ found Mr. Therrell's testimony was not credible because Mr. Therrell admitted that prior to the relevant time period "he performed two jobs 'under the table' after the original alleged onset date, indicating the claimant may [have] perform[ed] other under the table work more recently." AR 19. Mr. Therrell also continued to apply for work prior to his amended alleged onset date and during a time when he was experiencing syncopal episodes. *Id.*; *see also* AR 45–46 (discussing under-the-table work in 2008); AR 142 (stating the original onset date as February 1, 2008); AR 275–83, 267–73 (syncope episodes in 2008); AR 286–88, 314–17, 736, 807–08 (syncope episodes in 2009); AR 20, 378–97, 711 (syncope episodes in 2010). Mr. Therrell only stopped looking for work out of frustration of not being hired. AR 19. Although Mr. Therrell experienced multiple episodes of syncope *after* the relevant time period, AR 21, 36, 440, 452, 457–59, 464, 468, 486, 489, 495, 502, 506–07, 510–11, 522, 533, 542–59, 563–64, 566, 605, he suffered only two episodes during the relevant time period. The ALJ properly found that these two episodes did not limit Mr. Therrell's ability to work during the relevant time period. The ALJ did not err by failing to

include the language proposed by Mr. Therrell in the hypothetical posed to the VE.

### b. The ALJ did not err in relying on the VE's testimony at step five.

At step five, "[i]f a disability claimant shows that he can no longer perform any of his past jobs, he is disabled unless the administrative law judge (ALJ) finds that he can do some other kind of work." *Haddock v. Apfel*, 196 F.3d 1084, 1086 (10th Cir. 1999). Once the claimant shows he or she cannot return to his past relevant work, the "burden of going forward shifts to the Secretary, who must show that the claimant retains the capacity to perform an alternative work activity and that this specific type of job exists in the national economy." *Trimiar v. Sullivan*, 966 F.2d 1326, 1330 (10th Cir.1992) (internal quotation and citation omitted). "Work which exists in the national economy" means "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." *Id.* at 1329 n.8 (quoting 42 U.S.C. § 423(d)(2)(A)). If the Medical-Vocational Guidelines ("the grids") cannot be applied at step five, the Commissioner's burden cannot be satisfied "without producing expert vocational testimony or other similar evidence to establish the existence of significant work within the claimant's capabilities." *Ragland v. Shalala*, 992 F.2d 1056, 1058 (10th Cir. 1993). Factors the ALJ should consider when deciding if work exists in significant numbers include the level of the claimant's disability, the reliability of the VE's testimony, the claimant's ability to travel, the isolated nature of the job, and the type and availability of jobs. *Trimiar*, 966 F.2d at 1330. However, the decision is "ultimately left to the [ALJ's] common sense in weighing the statutory language as applied to a particular claimant's factual situation." *Id.*

In this case, there is no dispute that the grids do not apply. Instead, at the hearing, the ALJ elicited testimony from the VE that a person with Mr. Therrell's age, education, work experience, and RFC, would not be able to perform Mr. Therrell's past relevant work, but that

there were other jobs that he could perform in the regional or national economy. AR 59–60. Specifically, the VE offered three jobs at the medium exertional level: dishwasher, DOT No. 318.687-010 (500,000 jobs); bus boy, DOT No. 311.677-018 (300,000 jobs); and cook helper, DOT No. 317.687-010 (700,000 jobs); and three jobs at the light exertional level: folder, DOT No. 369.687-018 (400,000 jobs), hand packager, DOT No. 706.684-022 (200,000 jobs), and quality control inspector, DOT No. 221.587-010 (60,000 jobs). AR 60.

Mr. Therrell contends that the ALJ's determination of the number of jobs available in the national economy was not supported by substantial evidence. Doc. 18 at 14. He essentially argues that each of the jobs identified by the VE is a subcategory of a larger Occupational Employment Statistics ("OES") grouping, and by his calculations, the numbers suggested by the VE correspond to the larger OES grouping, rather than the subcategories corresponding to the jobs' DOT numbers. Doc. 18 at 14–15. Therefore, according to Mr. Therrell, the numbers of jobs provided by the VE are grossly inflated and do not constitute a "significant number" of jobs in the national economy. Doc. 18 at 14–15; Doc. 25 at 3–4. Mr. Therrell's argument is without merit.

Regulations require the Commissioner to take administrative notice of job information provided by the DOT. 20 C.F.R. § 404.1566. The DOT includes detailed descriptions of jobs (classified by their exertional and skill requirements) that exist in the national economy, 20 C.F.R. § 220.134(a), but does not provide numbers of jobs available. Consequently, the ALJ must either look to other reliable sources that provide the numbers of jobs available in the national economy for a particular DOT number, or the ALJ must obtain the testimony of a vocational expert to provide that evidence. *See* 20 C.F.R. § 404.1566 (d) (the ALJ may "take administrative notice of reliable job information available from various governmental and other

11

publications"); *see also Rogers v. Astrue*, 312 F. App'x 138, 142 ("The whole point of vocational testimony is to go beyond facts already established through publications eligible for judicial or administrative notice and provide an alternative avenue of proof."); *Haddock*, 196 F.3d at 1089–90 (citing a number of Social Security rulings which provide that an ALJ may use the DOT or other authoritative publications rather than a vocational expert) (internal citations omitted). In this case, the ALJ chose to rely on the testimony of a vocational expert. AR 23–24, 56–65.

On cross examination, the VE testified that although she identified the jobs using the DOT, she obtained the numbers of jobs by using "OES group numbers" from the Bureau of Labor Statistics. AR 62. The Occupational Employment Statistics ("OES") Survey is a federal-state cooperative program between the U.S. Department of Labor's Bureau of Labor Statistics and state workforce agencies that provides national occupational employment and wage rate estimates. *Anders v. Colvin*, 2015 WL 5555745, at *13 (D. Utah Sept. 18, 2015) (unpublished); *Guidry v. Astrue*, 2009 WL 4884282, at *5 (D. Colo. Dec. 10, 2009) (unpublished). Job data in the OES naturally varies from the DOT, as the OES classifies jobs by census codes, known as Standard Occupational Classification ("SOC") codes, rather than DOT codes. *McDonald v. Colvin*, 2015 WL 5749392, at *2 (E.D. Okla. Sept. 30, 2015) (unpublished). Courts in this district have found that the OES is a reliable source for the basis of VE testimony, and OES groupings are routinely used throughout the Tenth Circuit to support step five findings. *See Anders*, 2015 WL 5555745, at *13 ("The OES provides a reliable source of occupation data for use in various circumstances . . . ."); *Montoya v. Colvin*, No. 16cv116 GJF, Doc. 28 at 20–21 (D.N.M. Dec. 29, 2016) (citing numerous cases in this circuit that used OES groupings to support step five findings); *Guidry*, 2009 WL 4884282, at *5 (D. Colo. Dec. 10, 2009) (finding VE's testimony—based on OES groupings—a sufficient basis for the ALJ's determination that a

significant number of jobs existed in the national economy). To the extent Mr. Therrell objects to the ALJ's use of OES groupings, that objection is overruled. The ALJ did not err by relying on the VE's testimony about the numbers of jobs in the national economy.

Mr. Therrell argues that at least one of the jobs identified by the VE was inflated. He explains by way of example that "the DOT specific job of 'Hand Folder' (DOT # 369.687-018) is one of 553 specialty occupations in OES group 51-9198." Doc. 18 at 15. Mr. Therrell contends that "[t]he entire OES group contains approximately 400,000 jobs in the United States; however, the DOT specific job 'Hand Folder' contains only 132 jobs in the entire country." *Id.* Mr. Therrell does not direct the Court to any evidentiary support for this contention. Mr. Therrell's counsel presented the "hand folder" job numbers to the VE during cross-examination, but the VE did not agree with his numbers or conclusions. AR 63. Instead, the VE testified that she did not know whether his numbers were accurate. *Id.* There is no way for the Court to confirm the accuracy of these particular numbers.

At the hearing, Mr. Therrell's counsel presented data to the VE from a program called "Job Browser Pro," which apparently showed that there were only 132 apparel folder jobs available in the United States. AR 64. While the VE agreed that the data counsel presented to her showed 132 folder jobs, she never admitted that she used the Job Browser Pro program in her analysis of available jobs for this case. AR 61–65.[8] Accordingly, there is no basis in the record for Mr. Therrell's contention that the job number used by the VE for the folder job is "grossly

---

[8] Mr. Therrell contends that the VE admitted on cross examination that there were really only 132 hand folder jobs in the entire country rather than the 400,000 jobs to which she originally testified. Doc. 25 at 4. Reading the VE's testimony in context, however, it is clear that she agreed that there were 132 hand folder jobs based on the numbers in the Job Browser Pro data. AR 64-65. Twice she qualified her response to counsel's questions about the jobs listed in the Job Browser Pro with "If that's what you're looking at," but never agreed that she used that particular program in this case. AR 64.

13

inflated." Indeed, the Tenth Circuit recently rejected a similar argument. The Tenth Circuit explained:

> We reject this argument because Job Browser Pro is not among the examples listed in 20 C.F.R. § 404.1566(d) of data sources considered to provide reliable job information. Nor has [the claimant] established that Job Browser Pro is sufficiently reliable to contradict the VE's testimony. The VE's statement that Job Browser Pro "basically get[s its] information from the OES" . . . is insufficient to convince us that the numbers the VE gleaned from the OES are suspect to the point of failure as a source of substantial evidence.

*Anders v. Berryhill*, No. 15-4181, Slip Op. at 15 (10th Cir. Apr. 18, 2017) (unpublished).

Moreover, as the Commissioner points out, even if the folder job is eliminated from the six jobs identified by the VE, there still remain a significant number of jobs in the national economy which Mr. Therrell could perform. *See* Doc. 24 at 13–14. Mr. Therrell counters by inviting the Court to extrapolate from the percentage of folder jobs listed in the Job Browser Pro program to the other jobs identified by the VE. Doc. 25 at 4 (asking the Court to apply the decimal of .00033 to the number of each of the jobs identified by the VE). There is no basis in the law or the facts of this case that would authorize the Court to reduce the VE's numbers in this manner. The Court agrees with the Commissioner that even if the folder job is eliminated, the VE identified five other jobs that Mr. Therrell could perform that collectively offer a significant number of jobs in the national economy to support a finding of not disabled. AR 60.

**VI. Conclusion**

For the reasons stated above,

IT IS ORDERED that plaintiff's Motion to Reverse and Remand for a Rehearing (Doc. 18) is DENIED and the decision of the Commissioner is AFFIRMED.

_____
Laura Fashing
United States Magistrate Judge
Presiding by Consent

14